IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PATRICK JOSEPH MCGRATH** *et al.,* | : | |
| *Plaintiffs* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **CREDIT LENDERS SERVICE** | : | |
| **AGENCY, INC.,** | : | **No. 20-2042** |
| *Defendant* | : | |

## MEMORANDUM

PRATTER, J.                                                                    FEBRUARY 25, 2022

A party is not outside the reach of a federal statute simply because it says so. To conclude otherwise, of course, would obviate the need for laws at all. Credit Lenders Service Agency claims both that it is not a consumer reporting agency and that it does not issue consumer reports within the meaning of those terms in the Fair Credit Reporting Act. The Court is not convinced. Because the Court finds that Credit Lenders Service Agency falls within the FCRA, disputed factual issues remain as to whether it upheld its obligations under that law. Therefore, the Court denies Credit Lender Service Agency's motion for summary judgment in part and grants the motion in part.

### BACKGROUND

Plaintiffs Donna and Patrick McGrath applied to refinance their home mortgage with Police and Fire Federal Credit Union in 2019 ("the Bank"). As part of that application, the Bank engaged Credit Lenders Service Agency to conduct a public records search pertaining to the McGraths. *See, e.g.*, Doc. No. 22-1 ¶ 21.

1

According to company founder and CEO, Thomas R. Swider,[1] Credit Lenders Service Agency is in the business of providing various records to businesses at their request. *See, e.g.*, Doc. No. 22-4, Pl.'s Ex. 1, Thomas R. Swider Dep. at 45:5–46:6. The Agency then prepares a report, containing whatever information was ordered by the business, and sends that report back to the business. *Id.* To create that report, Credit Lenders Service Agency subcontracts with people who go out to the various repositories of records and actually do the physical search; the Agency calls these people "searchers," "abstracters," and/or "independent contractors." *See, e.g.*, Doc. No. 20-3, at 11, 19; Doc. No. 20-4, at 3.

As part of Credit Lenders Service Agency's process to provide a report to the Bank, it engaged an independent contractor, Shawn Schneider, to go to the Court of Common Pleas and engage in a search of both the open judgment directory and the municipal lien directory. *See* Doc. No. 22-4, Pl.'s Ex. 2, Schneider Dep. at 32:7–33:12. Mr. Schneider reviewed those indices looking for any match to the McGraths' name and address, and he then "abstracted" those results into a standard form, which he then sent back to the Agency. *Id.*; *id.* at 37:11–13. Credit Lenders Service Agency charges $25 for these "Judgment Reports," and Mr. Schneider received $14 for his portion of the work. *See, e.g.*, Doc. No. 22-1 ¶ 20. The Agency then included this Judgment Report as one part of a larger report that it sent back to the Bank. *See* Doc. No. 22-4, at 111–18, Pl.'s Ex. 9. In this instance, the report about the McGraths contained information about the McGraths' deed to their home, any outstanding water or sewer liens on their property, mortgages on the property, any other secured transactions, a valuation history of their property, the judgment report, and a copy of the deed to their house. *See id.*

---

[1] The Court notes that both Thomas R. Swider and Thomas J. Swider work at Credit Lenders Service Agency. Thomas R. Swider is founder and CEO, while Thomas J. Swider is company president.

According to the McGraths, Credit Lenders Service Agency's report to the Bank listed seven separate judgments against the McGraths in the Court of Common Pleas, erroneously stating that they had outstanding civil judgment debts in the amount of $284,350.64. The McGraths claim that they contacted Credit Lenders Service Agency in December 2019, but that the Agency refused to investigate the alleged inaccuracies unless and until directed to do so by the Bank and that a representative of the Agency stated that, even if it was contacted by the Bank, it would not reinvestigate the alleged inaccuracies without payment from the Bank. The McGraths claim that the inaccuracies in Credit Lenders Service Agency's Judgment Report caused the Bank to delay approval until January 2020, cost the McGraths money in the form of continued higher payments in the interim period, damaged their credit reputation, and caused emotional distress.

The McGraths argue that Credit Lenders Service Agency falls within the ambit of the FCRA and that the Agency negligently and willfully violated two sections of the FCRA, 15 U.S.C. §§ 1681e(b) and 1681i(a). Credit Lenders Service Agency moves for summary judgment, asserting that it is not subject to the FCRA as a matter of law and, even if it is, no reasonable juror could find that it violated either of the two statutory sections. The McGraths filed their response, the Agency filed its reply, the McGraths filed their sur-reply, and the Court heard oral argument on the matter, leaving the matter ripe for the Court's resolution.

### LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if "might affect the outcome of the suit under the governing law." *Id.*

The movant is initially responsible for setting out the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court[]that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," or by "showing that the materials cited [by the movant] do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The Court views the evidence presented in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

## DISCUSSION

Credit Lenders Service Agency sets out four primary arguments in favor of summary judgment. First, the Agency argues that the FCRA does not apply to it because it is not a "consumer reporting agency" and does not supply "consumer reports" within the meaning of the FCRA. Doc. No. 20-3, at 13–19. Second, the Agency argues that, even if it falls within the ambit of the FCRA, the Agency did not supply inaccurate information to the Bank and that its investigation of

4

the Judgment Report was reasonable within the meaning of the FCRA. *Id.* at 19–23. In support of this theory, Credit Lenders Service Agency avers that consumer reporting agencies are not required to look beyond the face of court documents to verify the accuracy of the information. This is based on the Agency's contention that precedent from the Court of Appeals for the Seventh Circuit has been adopted by the Court of Appeals for the Third Circuit. *See, e.g., id.* at 21–22. Third, Credit Lenders Service Agency argues that it was not responsible for resolving any dispute between the McGraths and the Bank. *Id.* at 23–25. Finally, Credit Lenders Service Agency argues that it did not act willfully or negligently within the meaning of the FCRA. The McGraths dispute each one of these arguments.[2] Doc. No. 22-3.

The Court will first address whether Credit Lenders Service Agency is regulated under the FCRA before turning to the substance of the FCRA sections at issue.

## I. Credit Lenders Service Agency Is a "Consumer Reporting Agency" and Issues "Consumer Reports" Within the Meaning of Those Terms in the FCRA

The sections of the FCRA that the McGraths allege Credit Lenders Service Agency violated, §§ 1681e(b) and 1681i(a), both regulate a "consumer reporting agency" and a "consumer report." *See* 15 U.S.C. §§ 1681e(b), 1681i(a). Thus, the threshold issue in this case is whether Credit Lenders Service Agency is a "consumer reporting agency" and whether it issues "consumer reports" as those terms are defined within the FCRA.

The Court begins with the text of the federal Fair Credit Reporting Act. Section 1681a(f) of that statute defines a "consumer reporting agency" as:

---

[2] In addition, and for the first time, the McGraths argue that Credit Lenders Service Agency is liable under the FCRA for their mortgage refinance application denial in 2018 *as well as* 2019. Doc. No. 22-3, at 6–7. The McGraths never raised this 2018 denial in their complaint. The complaint relates only to the delay of their application to refinance their mortgage in 2019. *See* Doc. No. 8, Am. Compl. ¶¶ 10, 24, 28. A plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Bell v. City of Phila.*, 275 F. App'x 157, 160 (3d Cir. 2008) (quoting *Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996)). Therefore, the Court will not address this argument on the merits.

> [A]ny person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f). The FCRA defines a "consumer report" as:

> [A]ny written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for. . . credit or insurance to be used primarily for personal, family, or household purposes.

15 U.S.C. § 1681a(d)(1).

Credit Lenders Service Agency argues that it does not fall within the FCRA because it is not a "consumer reporting agency" and does not issue "consumer reports." Instead, according to the Agency, it "merely" reports "Public Information," including the judgments that appear on the civil docket system of the Court of Common Pleas. Doc. No. 20-3, at 13–14. Credit Lenders Service Agency also argues if it is a consumer reporting agency under the FCRA, it would produce the absurd result that any clerk of court would also be a consumer reporting agency under the FCRA.[3] *Id.* at 18. The McGraths argue that the plain text of the FCRA forecloses the Agency's argument. *See* Doc. No. 22-3, at 4.

## A. The FCRA Definitions of "Consumer Reporting Agency" and "Consumer Report" are Not Mutually Dependent

The statutory language quoted above in which "consumer report" is used in the definition of "consumer reporting agency" and vice versa seems to create a chicken-or-the-egg problem.

---

[3] The Agency also appears to argue that it cannot be considered a "consumer reporting agency" because it only provides a $25.00 report. Doc. No. 20-3, at 18. This argument is facially flawed. The price an entity charges to prepare and provide consumer information has nothing to do with whether it falls within the ambit of the FCRA.

Indeed, Credit Lenders Service Agency relies on commentary within the FDIC's Federal Fair Lending and Credit Practices Manual to argue that the terms "consumer reporting agency" and "consumer report" are to be read as mutually dependent. Doc. No. 20-3, at 14–15, 19. In the Agency's view, an entity can only be a "consumer reporting agency" if it issues a "consumer report" and a report can only be a "consumer report" if it comes from a "consumer reporting agency." *See id.* at 14–16. But Credit Lenders Service Agency attempts to manipulate the language of the FCRA and the FDIC commentary to the point of meaninglessness.[4] The Court will not be duped into chasing its own tail with this statutory language.

To explain, it is helpful to first delineate the requirements of each term as they are defined in the FCRA. To be a "consumer reporting agency," the individual or business must (1) "regularly engage[]. . . in the practice of assembling or evaluating consumer credit information or other information on consumers," (2) "for monetary fees", (3) "for the purpose of furnishing consumer reports to third parties," (4) by "us[ing] any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." 15 U.S.C. §§ 1681a(f). On the other hand, a "consumer report" is a (1) communication of any information from a "consumer reporting agency," (2) bearing on one of the specified attributes of a consumer, (3) for "credit or insurance to be used primarily for personal, family, or household purposes; employment purposes; or any other purpose authorized under section 1681b." 15 U.S.C. § 1681a(d)(1).

Reading both definitions together, to be a "consumer reporting agency," an entity does not actually have to *furnish* a "consumer report." Instead, it must act "*for the purpose* of furnishing consumer reports." 15 U.S.C. §1681a(f) (emphasis added); *Zabriskie v. Fed. Nat'l Mortg. Ass'n,*

---

[4] The Court also notes that Credit Lenders Service Agency's own source belies its overarching legal position, stating that "alternative third-party data providers may be consumer reporting agencies, as defined by the FCRA." 2 Federal Fair Lending and Credit Practices Manual § 16.02 (2022).

940 F.3d 1022, 1027 (9th Cir. 2019) ("By its plain meaning, therefore, FCRA applies to an entity that assembles or evaluates consumer information with the intent to provide a consumer report to third parties."). Thus, an entity could be a "consumer reporting agency" within the FCRA if it acted *for the purpose* of furnishing a consumer report, even if, under some strange set of facts, it never produced that report or the intended report is later determined not to be a "consumer report." In other words, the Court does not need to determine that an entity actually produced a "consumer report" to find that it is a "consumer reporting agency."

But, however, the opposite is not true. The definition of "consumer report" within the FCRA clearly requires that the report come from a "consumer reporting agency." Thus, rather than being mutually dependent, as Credit Lenders Service Agency argues, the relationship of the two definitions might more properly be characterized as sequential. The definition of "consumer reporting agency" does *not* require that the agency actually produce a "consumer report", but to be a "consumer report," the report must come from a "consumer reporting agency."[5] In other words, the Court can first determine whether an entity is a "consumer reporting agency" and then determine if that agency issued a "consumer report."[6] Though without making it explicit, the Third Circuit Court of Appeals, controlling on this Court, is in lockstep with this Court's analysis. *See Fuges v. Southwest Fin. Servs., Ltd.* 707 F.3d 241, 247–48 (3d Cir. 2012).

Certain courts have, at times, confused this analysis. For example, some courts have first determined that an entity was not a "consumer reporting agency" and then confirmed that to be true by also finding the entity did not issue a "consumer report." *See, e.g., DiGianni v. Stern's*, 26 F.3d 346, 348–49 (2d Cir. 1994) (finding that retail stores were not "consumer reporting agencies"

---

[5] This logic is analogous to the elementary school geometry rule that a square is a rectangle, but a rectangle is not a square.

[6] The Court's interpretation is actually confirmed by the Agency's own source. *See* 2 Federal Fair Lending and Credit Practices Manual § 10.05 (2022).

because they did not fall within the statutory definition *and also* because they did not issue "consumer reports"). But such opinions are better understood as conforming to and confirming the Court's analysis explained above: if an entity is not a "consumer reporting agency" it cannot have issued a "consumer report." Still other courts complicated the analysis by first determining a report was not a "consumer report" and then, based on that assessment, found an entity was not a "consumer reporting agency." *See, e.g., Smith v. First Nat'l Bank of Atlanta*, 837 F.2d 1575, 1578 (11th Cir. 1988) ("[T]he Bank is not acting as a 'consumer reporting agency,' within the meaning of the Fair Credit Reporting Act, because, *inter alia,* it has not furnished a 'consumer report' as that term is defined in the Act."); *Lewis v. Ohio Prof'l Elec. Network, LLC*, 190 F. Supp. 2d 1049, 1057 (S.D. Ohio 2002) ("Defendant [] did assemble this . . . data for the purpose of furnishing it to third parties. Thus, if that information qualifies as a consumer report under FCRA, Defendant [] would be deemed a consumer reporting agency subject to the mandates of FCRA."). But this Court suggests that such a construct gets the analysis backwards. Plus, these referenced cases are out of circuit and not controlling precedent here. As a result, the Court declines to follow their analysis on this particular issue.

This conclusion also makes sense as a matter of statutory interpretation. The FCRA sometimes imposes obligations on a "consumer reporting agency" whether or not it issues a consumer report. For example, under § 1681e(d), the FCRA requires that a "consumer reporting agency" provide notice to an entity regarding that entity's responsibilities under the FCRA even if that entity does not issue a "consumer report." *See* 15 U.S.C. § 1681e(d)(1). Similarly, and directly relevant to the present dispute, § 1681i(a)(1)(A) imposes duties on "credit reporting agencies" to reinvestigate any disputed information in the consumer's *file* (not in the "consumer report").[7] In

---

[7] The FCRA defines "file" as "all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored." 15 U.S.C. § 1681a(g).

other words, it makes sense that Congress would *not* define the terms "consumer reporting agency" and "consumer report" to be mutually dependent in the way that Credit Lenders Service Agency argues.

The Court concludes that the definition of "consumer reporting agency" and "consumer report" are not mutually dependent in the way Credit Lenders Service Agency argues. The definition of "consumer report" is predicated on the report coming from a "consumer reporting agency," but a court does *not* need to first determine that an entity issues a "consumer report" in order to find that it is a "consumer reporting agency."

Plus, even if the two terms were mutually dependent, Credit Lenders Service Agency's argument still fails because it satisfies both definitions. The Court will address each in turn.

B. Credit Lenders Service Agency is a "Consumer Reporting Agency" Within the Meaning of That Term in the FCRA

As stated above, in order to be a "consumer reporting agency" within the meaning of the FCRA, there must be an individual or business that (1) "regularly engages. . . in the practice of assembling or evaluating consumer credit information or other information on consumers," (2) for monetary fees, (3) "for the purpose of furnishing consumer reports to third parties," and (4) using a facility of interstate commerce to either prepare or distribute those reports. 15 U.S.C. §§ 1681a(f); *Todd v. Associated Credit Bureau Servs., Inc.*, 451 F. Supp. 447, 448 (E.D. Pa. 1977).

First, Credit Lenders Service Agency received monetary fees for its services. The Agency charged the Bank $25 for each Judgment Report and, after paying Mr. Schneider $14, the Agency received $11 for each report. Doc. No. 22-1 ¶¶ 8, 20. The Agency also received money for the report in its entirety that it provided to the Bank. *See* Doc. No. 22-4, Pl.'s Ex. 1, Thomas R. Swider Dep. at 69:2–3; *id.*, Pl.'s Ex. 4, Thomas J. Swider Dep. at 72:2–3.

Second, Credit Lenders Service Agency used a facility of interstate commerce. *See Adams v. Nat'l Eng'g Serv. Corp.*, 620 F. Supp. 2d 319, 328 (D. Conn. 2009) (sending or receiving reports electronically constitutes use of facility of interstate commerce). The Agency sent the Judgment Report at issue to the Bank via email. Doc. No. 22-1 ¶¶ 21–22; Doc. 22-4, Pl.'s Ex. 4, Thomas J. Swider Dep. at 24:1–10.

The only remaining elements to address are elements one and three, whether (1) Credit Lenders Service Agency "regularly engages. . . in the practice of assembling or evaluating consumer credit information or other information on consumers" and (3) whether Credit Lenders Service Agency engages in their operations "for the purpose of furnishing consumer reports to third parties."

### 1. Credit Lenders Service Agency "Regularly" Engages in the Practice

First, as to the word "regularly," courts have placed special emphasis on the requirement that the business at issue must have a demonstrated a pattern of assembling or evaluating consumer credit information, such that it is routine, not a one-off event. *See, e.g., Owner-Operator Indep. Driver Ass'n, Inc. v. Usis Com. Servs., Inc.*, 410 F. Supp. 2d 1005, 1010 (D. Colo. 2005) (differentiating the motor carriers who issued consumer reports "regularly and for a fee" from businesses not held liable for "isolated" instances of issuing a consumer report); *Lewis*, 190 F. Supp. 2d at 1057 (interpreting "regularly" and noting that the FCRA's regulation of those who assemble or evaluate consumer credit information "'[i]n accordance with some consistent . . . practice'" ensures that the "FCRA serves to regulate only those parties whose role is 'vital'" (quoting *Johnson v. Fed. Express Corp.*, 147 F. Supp. 2d 1268, 1275 (M.D. Ala. 2001))).

Here, Credit Lenders Service Agency provided thousands of Judgment Reports over the years. *See* Doc. No. 22-4, Pl.'s Ex. 1, Thomas R. Swider Dep. at 56:8–9 ("We produce documents

just like this every day, hundreds of thousands of them over years."). Thus, the Court finds that Credit Lenders Service Agency "regularly" engages in this conduct.

### 2. Credit Lenders Service Agency Is "Assembling or Evaluating"

Second, as to the words "assembling or evaluating," their meaning and application are disputed by the parties and the case law. To begin, the use of the conjunctive "or" means that a court does not need to find that an alleged "consumer reporting agency" engaged in the practice of *both* assembling *and* evaluating—either alone is sufficient. Here, the main contention involves the meaning of the word "assembling" and not "evaluating."[8] Therefore, this analysis will only address the meaning of "assembling."

Engaging in statutory interpretation, a court is obliged to begin with the ordinary meaning of the words in that statute. *Travers v. Fed. Express Corp.*, 8 F.4th 198, 200 (3d Cir. 2021) ("Our limited task: interpret the words consistent with their ordinary meaning." (internal quotation marks omitted)). With this in mind, "assemble" means "to bring together (things) into one place or mass, to collect." *Assemble* (def. 2(a)), *Oxford English Dictionary* (2d ed. 1989). By another definition, it means "to bring together: such as to put or join together usually in an orderly way with logical selection or sequence." *Assemble* (def. 2(a)), *Merriam Webster Unabridged Dictionary* (2021).

The parties dispute whether Credit Lenders Service Agency's activity constitutes "assembling" under its ordinary meaning. The Agency accessed the Court of Common Pleas' database by using a publicly available computer within the Court of Common Pleas to pull an indexed list of names with open judgments. Doc. No. 22-4, Pl.'s Ex. 2, Schneider Dep. at 35:19–37:6. Thus, Credit Lenders Service Agency asserts, the Court of Common Pleas is the one

---

[8] Credit Lenders Service Agency argues that it does not "'score' assess, evaluate, or analyze the lawsuits, the legal papers, the judgments, or orders of the court, nor is it asked to do so." Doc. No. 20-3, at 6. Sensibly, the McGraths seem to concede this point by focusing on the word "or" in the "assembling or evaluating" language of the FCRA and directing the Court towards "assembling." Doc. No. 22-3, at 5.

"assembling" the records connected to names or addresses, the Agency is only *accessing* those records.

This argument, however, misses the forest for a single tree; it fails to understand that the Judgment Report is only one piece of the larger report that Credit Lenders Service Agency provided to the Bank. *See* Doc. No. 22-4, Pl.'s Ex. 9. In this document, the Agency included information about the deed to the McGraths' home, the grantor of their home, any outstanding mortgages, a list of any secured transactions or municipal liens on the McGraths' home, the value of the home, any other outstanding liens on the home, the Judgment Report at issue, and a copy of the deed to the McGraths' home. *Id.* If the Agency had only transmitted the Judgment Report in isolation, this might be a much tougher issue of statutory interpretation.[9] But there can be little debate that this consumer report constitutes the "assembling" of information under the plain dictionary definition of the word. In other words, even if Credit Lenders Service Agency did not engage in "assembling" for the one sub-part of its larger report, that is irrelevant for determining whether the Agency fits within the definition of "consumer reporting agency" under the FCRA. Indeed, in light of the full report, Credit Lenders Service Agency engaged in "assembling" because "one who assembles information does not necessarily change its contents. . . [t]he definition only requires that the assembler gather or group the information." *Lewis*, 190 F. Supp. 2d at 1058. In its full report to the Bank, the Agency certainly gathered and grouped information. In fact, CEO Thomas R. Swider noted that the Agency's final report would contain a "combination" of

---

[9] While not crucial to the Court's decision today, the Court notes that even the Judgment Report in isolation might still constitute "assembling" within the FCRA given that Mr. Schneider "abstracted the results from the computer system. . . [and] typed [them] up so [he] can send them in a neat format to [Credit Lenders Service Agency]." Doc. No. 22-4, Pl.'s Ex. 2, Schneider Dep. at 37:11–13. In short, there is a good argument that Mr. Schneider was engaged in the "assembling" of information even before the Agency assembled the full consumer report for the Bank.

In addition, Mr. Schneider noted that as part of that search process, he "would also get water and sewer. We would also get the judgments." *Id.* at 35:5–7. In other words, Mr. Schneider might have, as he has in other instances, discovered utility liens against the McGraths using a *different* search engine on the same computer which he would have then added them to the same judgment report. This, too, would almost certainly constitute "assembling."

information. Doc. No. 22-4, Pl.'s Ex. 1, Thomas R. Swider Dep. at 48:11–21. The Court is at a loss to call Credit Lenders Service Agency's actions anything other than the "assembling" of information.

Moreover, this conclusion regarding the plain meaning is supported by the scant case law to consider factual circumstances such as these. Courts of appeals have stated that the word "assembling" "'implies a function which involves more than receipt and retransmission of information'. . . The Act is not 'directed to those who supply information. . . [to] consumer reporting agencies, nor to those who are remote from those decisionmakers who rely upon 'consumer reports' in making credit and other decisions." *Smith*, 837 F.2d at 1579 (quoting *D'Angelo v. Wilmington Med. Ctr., Inc.*, 515 F. Supp. 1250, 1253 (D. Del. 1981)); *see also DiGianni*, 26 F.3d at 349 (same). And at least two other courts interpreting this definition of "assembling" have come to similar conclusions on analogous facts. *See, e.g.*, *Adams*, 620 F. Supp 2d at 322–28 (finding a subcontractor-headhunter to be a "consumer reporting agency" because it had ordered a background check," assemble[d]" the appropriate paperwork, and forwarded that information to the employer); *Lewis*, 190 F. Supp. 2d at 1052–54, 1057–61 (denying a nonprofit's motion for summary judgment that it was not a "consumer reporting agency" within the FCRA when the corporation shared information regarding bookings, arrests, and releases at county jails with the public for a fee).

Rather than engaging with this recent case law, Credit Lenders Service Agency relies on courts that have found a business which "supplies" information regarding its own customers' individual debts to a consumer reporting agency is not itself considered a "consumer reporting agency" within the meaning of the FCRA.[10] But this argument is doubly wrong. First, those cases

---

[10] *DiGianni v. Stern's*, 26 F.3d 346, 348–49 (2d Cir. 1994) (finding that retail stores that merely furnished information on consumer debt to consumer reporting agencies were not themselves "consumer reporting agencies"

relied upon an exception within the definition of "consumer report" for a "report containing information solely as to transactions or experiences between the consumer and the person making the report." 15 U.S.C. § 1681a(d)(2)(A)(i). The Agency does not purport to nor could it rely on this exception given that it is clearly not reporting any information about its own consumers. Second, after the 1996 Amendments to the FCRA, which post-date the cases cited by the Agency, the businesses involved could still be held liable as "furnishers" of credit information. Pub. L. No. 104-208, Div. A, Title II, § 2413(a)(2), 110 Stat. 3009-447 (codified as amended at 15 U.S.C. § 1681s-2). Thus, this argument gets the Agency nowhere.

Finally, the Court looks to what would be the logical and practical outcome. Indeed, at oral argument on this motion, counsel for Credit Lenders Service Agency conceded, as he must, a number of hypothetical situations in which a company would be "assembling" information. For example, Credit Lenders Service Agency conceded it would be "assembling" information if the independent contractor went to more than one courthouse to gather judgment information and then combined that information before sending it back to the Agency. But to have a business's status under the FCRA turn on such factual minutiae would be to create situations in which a business might be a "consumer reporting agency" as to one piece of information it supplies, but not as to another. For example, what if Credit Lenders Service Agency only went to one courthouse instead of two? Or, even more startling, a business might be a "consumer reporting agency" for one category of information in relation to one consumer, but not the same category of information in

---

because "[t]he FCRA does not impose obligations upon a creditor who merely passes along information concerning particular debts owed to it"); *Smith v. First Nat'l Bank of Atlanta*, 837 F.2d 1575, 1578 (11th Cir. 1988) (finding that a bank furnishing customer's alleged debt information to credit agency did not bring that bank within the FCRA definition of "consumer reporting agency"); *D'Angelo v. Wilmington Med. Ctr., Inc.*, 515 F. Supp. 1250, 1253 (D. Del. 1981) (finding that debt collection agency that reported delinquent debt to credit agency was not a "consumer reporting agency" based on the debt collection agency's "remote" position from the ultimate credit denial decision).

relation to a different consumer, like, for example, if the Agency only had to go to one courthouse for one person but two courthouses for another person.

Therefore, the Court finds that Credit Lenders Service Agency was engaged in the "assembling" of information within the meaning of the word in the FCRA.

### 3. *Credit Lenders Service Agency is Assembling "Consumer Credit Information"*

As to element (3) noted above, Credit Lenders Service Agency acted "for the purpose of furnishing consumer reports to third parties." First, the information in the Agency's consumer report constitutes "consumer credit information or other information on consumers" within the meaning of § 1681a(f). Indeed, Thomas R. Swider, CEO of Credit Lenders Service Agency, admitted as much. Doc. No. 22-4, Pl.'s Ex. 1, Thomas R. Swider Dep. at 70:16–18 ("Q: Okay. Do judgments about consumers speak to that consumer's credit worthiness or credit standing? A: Yes."). And it is undisputed that the Agency created the report for and furnished the report to the Bank to aid it in making a decision as to the McGraths' mortgage refinance application. *See, e.g.*, Doc. No. 22-1 ¶¶ 21–22. Thus, Credit Lenders Service Agency acted with the purpose to furnish a consumer report to the Bank. *See Adams*, 620 F. Supp. 2d at 328 (finding headhunter produced report for the purpose of furnishing consumer reports to third parties); *Lewis*, 190 F. Supp. 2d at 1058 (similar); *see also Zabriskie*, 940 F.3d at 1027–28 (discussing the meaning of "for the purpose of furnishing consumer reports").

It is also this statutory language that dispels Credit Lenders Service Agency's concern that a ruling finding it within the ambit of the FCRA would turn court clerks into "consumer reporting agencies." Doc. No. 20-3, at 18. The Court is not concerned about this outcome because, quite obviously, court clerks that prepare lists of judgments are not doing so "for the purpose of

furnishing consumer reports to third parties." Instead, clerks prepare lists of judgments for the purpose of creating public records.

Having considered each part of the definition, the Court finds that Credit Lenders Service Agency is a "consumer reporting agency" as a matter of law as that term is defined in the FCRA. For that reason, the Court denies the Agency's motion for summary judgment on this basis. The Court next addresses whether the Agency's report constitutes a "consumer report" within the meaning of the FCRA.

C.   Credit Lenders Service Agency Produces "Consumer Reports" Within the Meaning of That Term in the FCRA

Construing the definition of consumer reports within the meaning of the FCRA, a "consumer report" is a (1) communication of any information from a "consumer reporting agency," (2) bearing on one of the specified attributes of a consumer, (3) for one of the three purposes in the statute, but as relevant here, "for the purpose of serving as a factor in establishing the consumer's eligibility for. . . credit . . . to be used primarily for personal, family, or household issues." 15 U.S.C. § 1681a(d)(1); *accord Lewis*, 190 F. Supp. 2d at 1059.

Taking these requirements step by step, Credit Lenders Service Agency issued a "consumer report" within the meaning of the FCRA. As to the first element, the communication of any information from a "consumer reporting agency" refers back to what the Court just established: Credit Lenders Service Agency is a "consumer reporting agency" within the meaning of the FCRA. As to the second element, the Agency's report clearly "bear[s] on" the McGraths' "credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living" within the meaning of § 1681a(d)(1). Again, CEO Thomas R. Swider admitted as much in his deposition. Doc. No. 22-4, Pl.'s Ex. 1, Thomas R. Swider Dep. at 70:16–18.

As to the third element, whether the report was "for the purpose of serving as a factor in establishing the consumer's eligibility for. . . credit," the Agency also clearly meets this criterion. Again, Thomas R. Swider admitted that the Credit Lenders Service Agency reports are used by the Bank in making determinations on mortgage loans. *Id.* at 70:12–18.

Having considered each part of the definition, the Court finds that Credit Lenders Service Agency issues "consumer reports" as that term is defined in the FCRA. For that reason, the Court denies the Agency's motion for summary judgment on this basis as well. Because the Court concludes that Credit Lenders Service Agency falls within the ambit of the FCRA, the Court next turns to a discussion of whether the Agency violated any obligations under the FCRA.

## II.   There Is a Genuine Dispute of Material Fact Whether Credit Lenders Service Agency Violated the FCRA

Moving beyond the threshold issue, the McGraths allege that Credit Lenders Service Agency violated the FCRA in two ways: (1) negligently and willfully failing to follow reasonable procedures to assure maximum possible accuracy when preparing a consumer report in violation of 15 U.S.C. § 1681e(b), and (2) negligently and willfully failing to conduct a reasonable reinvestigation of the McGrath's dispute in violation of 15 U.S.C. § 1681i(a). The Court will address each in turn.

### A.  Section 1681e(b)

To establish that a consumer reporting agency negligently failed to comply with the requirements of § 1681e(b), a plaintiff must establish four elements: "(1) inaccurate information was included in a consumer's credit report; (2) the inaccuracy was due to defendant's failure to follow reasonable procedures to assure maximum possible accuracy; (3) the consumer suffered

injury; and (4) the consumer's injury was caused by the inclusion of the inaccurate entry." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 708 (3d Cir. 2010) (citation omitted).

Information is "inaccurate" within the meaning of the FCRA if it is incorrect or "misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Seamans v. Temple Univ.*, 744 F.3d 853, 865 (3d Cir. 2014) (internal quotation marks omitted). "[A] consumer report that contains technically accurate information may be deemed 'inaccurate' if the statement is presented in such a way that it creates a misleading impression." *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 902 (3d Cir. 2011) (quoting *Saunders v. Branch Banking & Trust Co.*, 526 F.3d 142, 148 (4th Cir. 2008)).

Here, the parties' arguments about the inaccuracy of the Judgment Report and the reasonable procedures overlap. The main dispute, however, centers on the second prong, whether "the inaccuracy was due to the defendant's failure to follow reasonable procedures." Indeed, a reporting agency is not automatically liable even if the consumer demonstrates some inaccurate information because the FCRA is not a strict liability statute. *See, e.g., Philbin v. Trans Union Corp.*, 101 F.3d 957, 963–64 (3d Cir. 1996); *accord Spence v. TRW, Inc.*, 92 F.3d 380, 383 (6th Cir. 1996) ("This section does not impose strict liability for inaccurate entries in consumer reports; the preparer is held only to a duty of reasonable care."). While Credit Lenders Service Agency attempts to claim that the Judgment Report did not contain any inaccurate information as a matter of law, *see* Doc. No. 20-3, at 20–21, the Agency is really arguing that it had no duty to investigate the information provided in the open judgment reports at the Court of Common Pleas. In other words, the Agency argues that, whether or not the information was slightly inaccurate, its procedures were reasonable as a matter of law. This argument, however, implicates a legal issue that the Court must address first before it can reach the factual issue.

*1. The Third Circuit Court of Appeals Did Not Adopt the Holding of*
*the Seventh Circuit Court of Appeals in* Henson

In *Henson v. CSC Credit Servs.*, 29 F.3d 280 (7th Cir. 1994), the Seventh Circuit Court of

Appeals examined a case in which the Bartholomew Circuit Court in Columbus, Indiana

incorrectly noted a money judgment in the judgment docket against a man relating to a car loan.

*Id.* at 282–83. As relevant here, the Seventh Circuit Court of Appeals discussed the requirements

of "reasonable procedures" under the FCRA and held that "as a matter of law, a credit reporting

agency is not liable under the FCRA for reporting inaccurate information obtained from a court's

Judgment Docket, absent prior notice from the consumer that the information may be inaccurate."

*Id.* at 285.

The parties here dispute whether *Henson* was adopted by the Third Circuit Court of

Appeals, with Credit Lenders Service Agency claiming it did and the McGraths claiming it did

not. *See* Doc. No. 22-3, at 10–11; Doc. No. 33, at 6–7; Doc. No. 34-1, at 4. The Agency points to

the Third Circuit Court of Appeals cases *Cushman v. Trans Union Corp.*, 115 F. 3d 220

(3d Cir. 1997), and *Philbin v. Trans Union Corp.*, 101 F.3d 957 (3d Cir. 1996), while the McGraths

counter with *Hutchinson v. Carco Group, Inc.*, No. 15-cv-1570, 2015 WL 5698283 (E.D. Pa. Sept.

29, 2015).

True, as Credit Lenders Service Agency points out, the Third Circuit Court of Appeals

cited *Henson* approvingly in both *Philbin*, 101 F.3d at 965, and *Cushman*, 115 F.3d at 224–25. But

that does not mean the Court of Appeals adopted *Henson* and declared certain procedures

reasonable as a matter of law. First, the *Philbin* court cited *Henson* only in the context of a

discussion regarding a plaintiff's burden of proof to demonstrate unreasonable procedures; it did

not decide that certain procedures are reasonable as a matter of law under the FCRA. *Philbin*,

101 F.3d at 965. Second, the *Cushman* court "assume[d] for the sake of argument" that a credit

reporting agency could rely on the face of a court record *initially*, *i.e.*, as part of its reasonable investigation, but could *not* rely on the face of a court record if required to *reinvestigate*. *Id.* at 224–25. Thus, again, the Third Circuit Court of Appeals made no determination that certain procedures would be considered reasonable as a matter of law.

Moreover, subsequent Third Circuit decisions have been clear that the reasonableness of a consumer reporting agency's procedures is a question for the jury. *Cortez*, 617 F.3d at 709. In other words, there would be direct tension between, on the one hand, holding that certain procedures are reasonable as a matter of law and, on the other hand, holding that reasonableness is a question of fact for the jury. *See id.* ("Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party."). Plus, numerous district courts within the Third Circuit have concluded that the Court of Appeals has never adopted the Seventh Circuit's holding in *Henson*. *See, e.g.*, *O'Brien v. Equifax Information Servs., LLC*, 382 F. Supp. 2d 733, 739 (E.D. Pa. 2005) (distinguishing a related Seventh Circuit case, *Sarver v. Experian Info. Sols.*, 390 F.3d 969 (7th Cir. 2004)); *Hutchinson*, 2015 WL 5698283, at *4; *Dively v. Trans Union LLC*, No. 11-cv-3607, 2012 WL 246095, at *4–5 (E.D. Pa. Jan. 26, 2012); *O'Connor v. Trans Union Corp.*, No. 97-cv-4633, 1999 WL 773504, at *4 (E.D. Pa. Sept. 29, 1999). The court in *Hutchinson* explained that district courts within the Third Circuit have "explicitly rejected" the Seventh Circuit's "presumption of reasonableness for certain reliable records." *Hutchinson*, 2015 WL 5698283, at *4.

Considering all of this, this Court rejects Credit Lenders Service Agency's argument. Therefore, this Court concludes that *Henson* is not controlling law in the Third Circuit and will proceed to analyze the McGrath's claims under the FCRA on that basis.

> 2. *There Is a Genuine Dispute of Material Fact Whether Credit Lenders Service Agency Negligently Failed to Follow Reasonable Procedures in Violation of § 1681e(b) of the FCRA*

The McGraths argue that Credit Lenders Service Agency did not follow reasonable procedures in producing the Judgment Report, which contained numerous incorrect judgments. The Agency disagrees.

Section 1681e(b) provides: "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). As interpreted by the Third Circuit Court of Appeals, "[r]easonable procedures are those that a reasonably prudent person would undertake under the circumstances. Judging the reasonableness of a credit reporting agency's procedures involves weighing the potential harm from inaccuracy against the burden of safeguarding against such inaccuracy." *Cortez*, 617 F.3d at 709. On questions of reasonableness, it is "normally a question for trial unless the reasonableness or unreasonableness of the procedures is beyond question. *Id.* (citation omitted). In making that determination during pre-trial litigation, the Third Circuit has identified three possible approaches to a plaintiff's burden of proof on this issue: "[1] that a plaintiff must produce some evidence beyond a mere inaccuracy in order to demonstrate the failure to follow reasonable procedures; [2] that the jury may infer the failure to follow reasonable procedures from the mere fact of an inaccuracy; or [3] that upon demonstrating an inaccuracy, the burden shifts to the defendant to prove that reasonable procedures were followed." *Id.* at 710 (internal quotation marks omitted). The Third Circuit has

never had an occasion to select any one of these three approaches and has, instead, applied all three. *See, e.g.*, *Cortez*, 617 F.3d at 710; *Philbin*, 101 F.3d at 965–66.

Under any of the three possible approaches identified by the Third Circuit Court of Appeals, there is a genuine dispute of material fact as to whether Credit Lenders Service Agency's investigation procedures were "reasonable" under the FCRA. Under the first two approaches, the McGraths have produced evidence beyond a mere inaccuracy and evidence from which a jury could infer the failure to follow reasonable procedures from an inaccuracy. The McGraths introduced evidence that the Agency simply copies the indexed list of open judgments provided by the Court of Common Pleas. Credit Lenders Service Agency does not dispute this; instead, the Agency argues it had no obligation do anything more than that and that no reasonable juror would find that approach unreasonable. *See, e.g.*, Doc. No. 20-4 ¶¶ 131–41. But, as Mr. Schneider confirmed, a "searcher" or "abstracter" would be able to get a copy of the actual dockets for free on the Philadelphia government website and that the entire process would take "maybe two minutes." Doc. No. 22-4, Pl.'s Ex. 2, Schneider Dep. at 44:3–21. In other words, taking the most conservative estimate from Mr. Schneider that the general judgment search takes five to ten minutes, *id.* at 38:16–24, the Agency could pull a judgment report and cross-check that judgment against the actual individual docket in, at most, twelve minutes to determine whether there is in fact a judgment against the subject of the search or whether the judgment has been paid or vacated. And CEO Thomas R. Swider confirmed that Credit Lenders Service Agency does not check the substance of the information it provides to customers. *See* Doc. No. 22-4, Pl.'s Ex. 1, Thomas R. Swider Dep. at 47:16–49:17. Thus, reasonable jurors could fault the Agency for the failure to do even that rudimentary quality control. In other words, the McGraths have met their burden under both of the first two approaches.

23

The McGraths have also met their burden under the third approach because Credit Lenders Service Agency has not even attempted to introduce evidence that their procedures *are* reasonable. Instead, the Agency simply argues that they should not be required to do anything more. For example, Credit Lenders Service Agency argues that it had no obligation do anything more than copy the court records. But that is not a rebuttal, that is a denial. Second, the Agency claims that it had no authority or expertise to determine the state of the court dockets. But again, that is a denial, not evidence of reasonableness. Plus, reasonable jurors could find that lack of expertise to be its own fault: Credit Lenders Service Agency's contractors receive no training. *See id.* at 50:13–21. Or, in the alternative, reasonable jurors could find that searchers do not need legal training to read a court docket to decide the basic fact of whether a judgment is open or closed. Finally, the Agency insists that it need not do more investigation because it charges a mere $25 for each report. But Credit Lenders Service Agency cannot ward off liability by hiding behind the competitive prices the Agency itself set. In short, Credit Lenders Service Agency's arguments seem to be that their procedures were reasonable "because I said so." The Court is not convinced.

In sum, the McGraths have likely demonstrated (1) more than a mere inaccuracy, (2) that a jury might infer the lack of reasonable procedures, and (3) that Credit Lenders Service Agency has failed to rebut the claimed lack of reasonable procedures. *Cortez*, 617 F.3d at 710. And the question of reasonableness is generally a jury question unless the question of reasonableness is "beyond question." *Id.* at 709. Here it is certainly not "beyond question" that Credit Lenders Service Agency's investigation procedures were reasonable as a matter of law. Therefore, the Court denies summary judgment on this issue.

### B. Section 1681i(a)

The McGraths also claim that Credit Lenders Service Agency violated the FCRA by failing to conduct a reasonable reinvestigation when the McGraths called and alerted them to the

inaccuracies in the Judgment Report. The Agency avers that the McGraths provided no notice of their dispute, as is require under the FCRA.

Section 1681i(a) of the FCRA states that if (1) "the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer," and (2) "the consumer notifies the agency directly, or indirectly through a reseller, of such dispute," then (3) "the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file." § 1681i(a)(1)(A).

Credit Lenders Service Agency moves for summary judgment under the second element, arguing that it never received notice of the McGraths' dispute. The Agency argues that there is no evidence in the record to support the McGraths' claim and thus no genuine dispute of material fact. As the non-moving party, the McGraths must point the Court to some evidence in the record to demonstrate that there *is* a genuine dispute of material fact. Fed. R. Civ. P. 56(c). They have not done so.

The McGraths' argument would require the Court to make certain impermissible inferences from the factual record. First, the McGraths point to their phone bill to demonstrate they made a phone call to Credit Lenders Service Agency on December 4, 2019 that lasted approximately 5 minutes. Doc. No. 22-5, Pl.'s Ex. 30. The Agency does not dispute this call. Doc. No. 22-4, Pl.'s Ex. 1, Thomas R. Swider Dep. at 65:12–21; Doc. No. 22-4, Pl.'s Ex. 4, Thomas J. Swider Dep. at 61:7–18. Second, Mr. McGrath clarified the substance of that phone call in his subsequent deposition testimony. He testified that he called Credit Lenders Service Agency and was "first. . . asked if [he was] from a lender", then he "was told there would be a fee for any action", then the Agency "put him on hold" before Mr. McGrath hung up. Doc. No. 22-5, Pl.'s Ex. 31, McGrath

Dep. at 114:12–16. The McGraths want the Court to infer that the Agency would not have said there would be a fee for something unless the McGraths had requested something—*i.e.*, unless the McGraths notified Credit Lenders Service Agency of an error in the judgment report and requested a reinvestigation. But while the Court views the evidence presented in the light most favorable to the non-moving party, *Anderson*, 477 U.S. at 255, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient." *Betts*, 621 F.3d at 252. Plus, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient. *Anderson*, 477 U.S. at 252. Therefore, the Court finds that the McGraths have not met their burden as non-moving party to demonstrate a genuine dispute of material fact on this issue and grants Credit Lenders Service Agency's motion for summary judgment on the McGrath's reinvestigation claim.

### III. There is No Genuine Dispute that Credit Lenders Service Agency's Conduct Was Not "Willful"

While denying Credit Lenders Service Agency's motion for summary judgment under §§ 1681e(b) and granting it under 1681i, both for negligent conduct, the court grants summary judgment in favor of the Agency on the issue of whether its conduct was "willful" within the meaning of that term in the FCRA.

"[I]n order to show a willful violation of the FCRA, a plaintiff must prove that the defendant knowingly and intentionally" or recklessly "committed an act in conscious disregard for the rights of others." *Hutchinson*, 2015 WL 5698283, at *6 (internal quotation marks omitted); *accord Cortez*, 617 F.3d at 721. "A defendant's conduct is reckless only if it was 'objectively unreasonable' in light of 'legal rules that were clearly established at the time.'" *Fuges*, 707 F.3d at 249 (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69–70 (2007)). In other words, even if a party misreads the FCRA, it is liable only if its reading is "objectively unreasonable." *Id.* "'[W]here . . .the statutory text and relevant court and agency guidance allow for more than one

reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator.'" *Id.* (quoting *Safeco*, 551 U.S. at 70 n.20). Indeed, under *Safeco*, the question is whether the party's "interpretation that would allow the conduct in question is 'an interpretation that could reasonably have found support in the courts.'" *Id.* at 251 (quoting *Safeco*, 551 U.S. at 70 n.20). Thus, the *Safeco* analysis establishes "a safe harbor against liability for willfulness" as a matter of law. *Fuges*, 707 F.3d at 248. The Court will separately address each subsection of the FCRA at issue here.

A. Credit Lenders Service Agency Did Not Willfully Violate § 1681e(b)

The Court begins with Credit Lenders Service Agency's alleged violations under § 1681e(b). The Agency relied on the Third Circuit Court of Appeals' decision in *Cushman*, which, as noted above, discussed the Seventh Circuit Court of Appeals decision in *Henson*. Credit Lenders Service Agency claims that *Cushman* and *Henson* stand for the proposition that relying on the face of court documents is reasonable as a matter of law. As such, the Agency argues that its reading of the FCRA was not objectively unreasonable. The Court agrees, but with an important qualification moving forward.

The *Hutchinson* court itself confronted whether the law was clearly established on this exact same legal issue and ruled that the lack of a Third Circuit Court of Appeals decision on this issue meant that it was not. *Hutchinson*, 2015 WL 5698283, at *6. Here, the Agency's interpretation of *Cushman*, the only Third Circuit opinion on this issue, is not so far afield as to render its actions "willful" within the meaning of the FCRA. In other words, Credit Lenders Service Agency's interpretation could have reasonably found support in the courts. Therefore, the Court agrees with the Agency that any violation of § 1681e(b) was not "willful" under the FCRA.

The Court notes, however, there is a growing chorus of district courts that have stated that the Seventh Circuit Court of Appeals' decision in *Henson* is not the law in the Third Circuit.

*See, e.g., Hutchinson*, 2015 WL 5698283, at *4; *Dively*, 2012 WL 246095, at *5 ("*Henson* is not

... the law of this Circuit."); *O'Brien*, 382 F. Supp. 2d at 739 ("The Third Circuit has not provided

guidance as to what procedures are reasonable as a matter of law."). Indeed, the *Hutchinson* court

could not have been clearer that the Third Circuit has *not* adopted *Henson* and that "the Third

Circuit has never defined circumstances in which a [credit reporting agency's] procedures will be

considered reasonable as a matter of law." *Hutchinson*, 2015 WL 5698283, at *4. This Court adds

its voice to that chorus.

### B. Credit Lenders Service Agency Did Not Willfully Violate § 1681i(a)

The Court already determined that there is no genuine dispute that the McGraths did not

properly notify Credit Lenders Service Agency regarding the disputed information, and, thus, the

Agency could not be liable for negligently failing to conduct a reasonable reinvestigation. For that

same reason, there is no genuine dispute that it did not willfully violate the same portion of FCRA.

Therefore, the Court grants Credit Lenders Service Agency's motion for summary judgment on

this issue as well.

The Court notes, however, that were the McGraths to have demonstrated a genuine issue

of material fact that they had notified Credit Lenders Service Agency, this would be a much closer

call. The Agency's position on this issue is that, unless the Bank contacted the Credit Lenders

Service Agency regarding investigation of that Judgment Report, it had no duty to conduct further

investigation. Doc. No. 20-3, at 24. But the Agency's support for this argument is, at base, its own

non-legal opinion. In a familiar refrain, Credit Lenders Service Agency claims it is not subject to

the FCRA simply because its CEO, Thomas R. Swider, says that is so. But the Agency has not

sought legal advice to determine whether it falls within the FCRA.[11] In fact, Credit Lenders Service

---

[11] *See, e.g.,* Doc. No. 22-4, Pl.'s Ex. 1, Thomas R. Swider Dep. at 67:15–68:1 ("Q: Is there any other reason why you don't think you're a consumer reporting agency? A: I know we're not a consumer reporting agency. Q: Okay.

Agency is a credit reporting agency and it should have known so. Its name is, after all, "Credit Lenders Service Agency." In other words, the Agency's position that it is not subject to the FCRA essentially amounts to putting its head in the sand. But the Court admonishes Credit Lenders Service Agency and Mr. Swider: moving forward, the ostrich approach to matters of federal law will not suffice.

CONCLUSION

A party is not relieved from the obligations imposed by federal law merely because it says so. It is a court's job to make such determinations.

Because this decision had many parts, the Court will summarize and clarify. First, the Court denies summary judgment on the issue of whether Credit Lenders Service Agency falls outside the FCRA. Credit Lenders Service Agency falls within the ambit of the FCRA as a matter of law. Second, the Court denies summary judgment on the issue of whether Credit Lenders Service Agency negligently violated 15 U.S.C. §§ 1681e(b). Third the Court grants summary judgment on the issue of whether Credit Lenders Service Agency violated 1681i(a). Finally, the Court grants summary judgment on the issues of whether Credit Lenders Service Agency willfully violated §§ 1681e(b) and 1681i(a). An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

But what I'm asking you right now is there any other reason why you don't think you are? A: No. Q: Okay. Now, when you say you know you're not a consumer reporting agency, did you ask somebody for advice on that? A: No.").